UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

UNITED STATES OF AMERICA          *          CRIMINAL NO. 12-0345

VERSUS                            *          JUDGE ROBERT G. JAMES

WILLIAM A. IRAHETA                *          MAG. JUDGE KAREN L. HAYES
CHRISTIAN M. GONZALEZ
RODOLFO MERAZ-GARCIA

REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, are three Motions to Suppress [docs. # 43, 44, 47] filed individually by Defendants William A. Iraheta, Christian M. Gonzalez, and Rodolfo Meraz-Garcia (collectively "Defendants"). For reasons stated below, it is recommended that the motions be **GRANTED**.

On October 27, 2012, Deputy Seth Cox of the Ouachita Parish Sheriff's Office ("OPSO") stopped William A. Iraheta ("Iraheta"), Christian M. Gonzalez ("Gonzalez"), and Rodolfo Meraz-Garcia ("Meraz-Garcia") for a traffic violation on Interstate 20 heading eastbound in the West Monroe, Louisiana area. Defendant Iraheta was driving his automobile with Defendant Gonzalez in the front passenger seat and Defendant Meraz-Garcia in the rear of the vehicle. Pursuant to the stop, Deputy Cox ultimately searched the vehicle and discovered 6,976 grams of cocaine and 1,331 grams of crystal methamphetamine.

On December 19, 2012, a federal grand jury returned a four count indictment against Defendants for (1) conspiracy to distribute cocaine, (2) conspiracy to distribute

methamphetamine, (3) knowingly and intentionally possessing with the intent to distribute

cocaine, and (4) knowingly and intentionally possessing with the intent to distribute

methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 846 and 21 U.S.C. § 841(a), 18 U.S.C.

§ 2.  [doc. # 23].  Having entered pleas of not guilty [doc. # 32] to the charges against them,

Defendants filed the instant motions to suppress evidence obtained as a result of the traffic stop.

Following delays for briefing and an evidentiary hearing held on February 13, 2013, the matter is

now before the Court.

### Background

The following facts were established via the testimony and evidence presented at the

February 13, 2013 hearing held in this matter.  The testimony of each witness is summarized

below.

### Deputy Seth Cox

Deputy Seth Cox has been employed with the OPSO for the past three and a half years.

(Tr. 4).  On October 27, 2012, the date of the traffic stop, Deputy Cox was on patrol in a marked

OPSO car[1] near I-20 in West Monroe, Louisiana.  *Id.*

At approximately 2:45AM, Deputy Cox was getting onto I-20 eastbound from the Camp

Road exit when he observed a vehicle apply its brakes.  *Id.*  After observing the vehicle brake, he

positioned his unit directly behind the vehicle in the right lane of travel and observed the vehicle

cross the centerline and go back into its lane of travel without first activating a turning signal.

*Id*; *see also* (Tr. 66).  In a OPSO Incident Report dated the day of the stop, Deputy Cox stated

that he observed "the vehicle cross the center line and enter[] the left lane of travel, then abruptly

---

[1]  According to Deputy Cox, his unit is not equipped with a functioning camera or audio
capturing system.  (Tr. 11).

turn back into the right lane of travel." [Def. Ex. No. 2].   On cross examination, Deputy Cox elaborated on the vehicle's abrupt lane change, stating that when the vehicle crossed the center line and entered the left lane of travel, the whole vehicle did not go into the left lane, only the driver's side tire drifted over the center line. (Tr. 16). Then, Deputy Cox ran the license plate because he was planning on initiating a traffic stop on the vehicle. (Tr. 4).   Additionally, in the Incident Report, Deputy Cox stated that he planned to initiate the traffic stop out of concern the driver of the vehicle might either be intoxicated or falling asleep while driving.  [Def. Ex. No. 2]. According to Deputy Cox's testimony, the license plate "was showing to be suspended out of California."  (Tr. 5).  Because Deputy Cox observed several passengers in the vehicle, he wanted another deputy on the scene for safety purposes.  *Id.*   He determined that there was a deputy close to Thomas Road, and accordingly, he followed the vehicle to Thomas Road and initiated the traffic stop there.[2]  *Id.*  As the vehicle approached the Thomas Road exit, the driver activated the "right turn signal like it was going to exit.  It slowed down for approximately one half of a mile . . . [then] deactivated that turn signal and accelerated like it was going to go past the exit." *Id.*  Ultimately, Deputy Cox testified that the vehicle was stopped for "[i]mproper lane usage and to investigate why the tag was showing to be suspended out of California."  *Id.*

After executing the stop, Deputy Cox made contact with the driver of the vehicle, Defendant Iraheta, explained the reason for the stop, and asked for Defendant Iraheta's driver's

---

[2] Pursuant to Fed R. Evid. 201, the undersigned notes that the distance between the I-20 east Camp Road exit (numbered 107) and the entry point to Thomas Road is 7.0 miles.  Driving Directions from Camp Road exit to Thomas Road, West Monroe, Google Maps, https://www.google.com/maps?saddr=Interstate+20+E&daddr=Thomas+Rd,+West+Monroe,+LA&hl=en&sll=32.51032,-92.244241&sspn=0.242909,0.308647&geocode=FWUP8AEdmf9_-g%3BFaLs7wEdrMqB-inPIMLH6DcuhjG1_CFGB3paMQ&oq=thomas+t&t=h&mra=prev&z=12; *see also* (Tr. 74).

license and vehicle registration.  (Tr. 6).  According to the Incident Report, Defendant Iraheta

told Deputy Cox that "he was very tired and was looking for a place to stop and spend the night."

[Def. Ex. No. 2].  Deputy Cox immediately ran Iraheta's driver's license for validity and

checked for outstanding warrants.  (Tr. 6).  At this point, according to the Incident Report,

Deputy James Christopher Honey and Deputy Matthew Waggoner arrived at the scene to assist

Deputy Cox with the traffic stop.  [Def. Ex. No. 2].  Headquarters advised them that the driver's

license was showing to be suspended out of California. (Tr. 6).  According to Deputy Cox's

testimony and the Incident Report, he asked Defendant Iraheta exit the vehicle and began to

question him regarding his travel itinerary, which revealed that he and "some cousins . . . were

going to Miami, Florida from . . . Long Beach, California . . . for a [family member's] birthday

party."  [Def. Ex. No. 2]; (Tr. 6-7).  At this point, Deputy Cox decided to investigate further into

the occupants' travel itinerary because "it seemed like a[n] odd reason – a long ride for a

birthday party."  (Tr. 7).

Therefore, Deputy Cox made contact with the front seat passenger, Defendant Gonzalez,

and began to question him regarding his travel itinerary.  (Tr. 8).  Deputy Cox testified that

according to Defendant Gonzalez, the Defendants "were not cousins, they were not family";

however, Defendant Gonzalez did confirm that they were traveling from California to Miami,

Florida, for a birthday party.  *Id*.  Regarding Defendant Gonzales' demeanor, Cox testified that

it was suspicious because "[h]e was very short with me on my questions and answers," and "[h]e

would also look back to the passenger in the rear seat as he was answering my questions."  *Id.*

On cross examination, Deputy Cox conceded that he had no knowledge of nor did he endeavor

to determine Defendant Gonzales' English speaking abilities.[3]  (Tr. 38, 56).

After questioning Defendant Gonzales, Deputy Cox confronted Defendant Iraheta about the conflict in their stories – that is, whether the Defendants were cousins or merely friends.  (Tr. 8).  According to Deputy Cox, Defendant Iraheta stated "they were like family." *Id.*  Because of Defendants' conflicting stories and Defendant Gonzales' nervous behavior, Deputy Cox requested Defendant Iraheta's consent to search his vehicle for any contraband that might be inside.  [Def. Ex. No. 2]; (Tr. 9).  Although Deputy Cox could not recall verbatim how he requested consent, he did testify that he did not inform Defendant Iraheta of his right to refuse consent and noted that "Deputy Honey was standing there with [him] when [they] got consent." (Tr. 39-40, 43).   Deputy Cox testified that Defendant Iraheta gave his general consent to the entire vehicle; therefore, he removed all three Defendants from the vehicle and patted them down for officer safety reasons.  (Tr. 9-10).

While Deputy Cox was searching the vehicle, Defendant Iraheta requested his jacket from the vehicle's trunk area.  (Tr. 10).  Under the supervision of the deputies, Defendant Iraheta "walked to the trunk, retrieved his jacket and then walked back with the other parties on the side of the interstate." *Id.*  According to Deputy Cox, Defendant Iraheta's "jacket was lying on top of the stuff in the back of the trunk," not in a specific compartment or bag. *Id.*  Ultimately, Deputy Cox discovered "a black duffel bag substantially heavier than the other duffel bags."  (Tr. 9). Although Deputy Cox acknowledged that there was more than one bag in the trunk, he could not recall the exact number of bags.  (Tr. 46).  Additionally, he testified that he didn't know who the bags belonged to at the time, never inquired into their ownership, and had no reason to believe

---

[3]  The undersigned observes that during the hearing an interpreter was provided for Defendant Gonzalez to assist his understanding of witness testimony. *See, e.g.,* (Tr. 56).

that Defendant Iraheta had the authority to give permission to search the bags.  *Id.*  Upon opening the duffle bag, Deputy Cox located shrink-wrapped packages covered in duct tape at the bottom.  (Tr. 10).  Specifically, Deputy Cox testified that there were "seven packages containing suspected cocaine and three packages containing suspected methamphetamine."  (Tr. 10-11).

On cross-examination, defense counsel played a number of dispatch audio recordings from the night of the traffic stop.[4]  In audio recording 2:48:50, Deputy Cox (identified in the recordings as "Unit 203") ran the plate of Defendant Iraheta's vehicle.  [Def. Ex. 3, 2:48:50]; *see also* (Tr. 21).  Deputy Cox testified that, at the 2:48:50 point, he "would have already seen [Defendant Iraheta] apply his brakes" and the "driver's side tires cross the center line and come back into the right lane," as described *supra*.  (Tr. 21-22).  In recording 2:49:55, a dispatcher states " . . . unknown insurance information, comes registered to a William A. Iraheta . . ." [Def. Ex. 3, 2:49:55]; *see also* (Tr. 22).

In recording 2:55:28, an individual states "I'm at the exit."  [Def. Ex. 3, 2:55:28].  Deputy Cox testified that the individual "sounded like me"; however, he could not recall whom he was informing that he was at the exit.  (Tr. 23).  Defense counsel inquired as to whether Deputy Cox had, at this point, already pulled the vehicle over.  *Id.*  Deputy Cox denied having already initiated the traffic stop because he "would have called 1090 . . . when [he] pulled [the vehicle] over. . . [he] wouldn't just stop a vehicle without putting it on the radio, for obvious safety reasons."  *Id.*  In recording 2:55:28, Deputy Cox requested that dispatch run the Vehicle Identification Number ("VIN") of the vehicle and Defendant Iraheta's driver's license ("the

_____

[4]  The dispatch recordings were entered into the record as Defendant's Exhibit 3.  There are a total of thirty recordings labeled with the date, time (hour: minute: second), and numbered chronologically from 1-30.  Hereinafter, citations to these recordings will include the precise time as labeled in Defendant's Exhibit 3.

26"). [Def. Ex. 3, 2:55:28]. At this point in the hearing, Deputy Cox corrected his previous testimony, stating that by 2:55:28 he would have been indeed physically standing by the vehicle and had already initiated the traffic stop. (Tr. 24). Next, in recording 2:57:47, the dispatcher responds to Deputy Cox's previous request, stating "vehicle registration is suspended as of 10/08/12 . . . the subject's 26's is suspended at this time as well." [Def. Ex. 3, 2:55:28]; *see also* (Tr. 25).

After listening to this recording, Deputy Cox concluded that the first notification he had that the vehicle registration was suspended must have been after he initiated the traffic stop, not before as he had testified on direct examination. (Tr. 25). However, on March 14, 2013, the Government moved to supplement the record with an additional audio recording, which it alleges was discovered on March 12, 2013. [doc. # 69]. According to the Government's motion, the audio recording "is a thirty-one second communication between a dispatcher and Deputy Seth Cox . . . in which he was informed that Defendant Iraheta's vehicle registration was suspended. Dep. Cox replied '10-4.'" *Id.* at 2. In the Government's post-hearing brief, it states that the audio communication was made at 2:50:19, and it "reveals that dispatch notified Deputy Cox of the expired registration *before* (1) Deputy Cox gave dispatch the VIN to Iraheta's car at 2:55:28 and (2) Deputy Cox notified dispatch of his intention to initiate a traffic stop at 2:51:48." [doc. # 68, P. 7-8]. Thus, the newly submitted recording supports Deputy Cox's initial testimony regarding his recollection of the order of events.

Additionally, on cross-examination, the defense introduced a CAD Call Information Sheet ("CAD Sheet") identified as Defendant's Exhibit 4.[5] According to the CAD Sheet, the

---

[5] According to Deputy Honey, the CAD Call system is maintained by dispatchers, who actually type the information into the CAD database. (Tr. 104). Additionally, to his knowledge,

location of the stop was I-20 east exit 114.  [Def. Ex. 4].  Moreover, it states that Deputy Cox

was "At Scene" and "Assigned as Primary" at 10/27/12 at 2:44:46.  *Id.*  According to Deputy

Cox's testimony, "Assigned as Primary" means that he "worked the case"; however, he could

not testify further as he did not "feel comfortable answering questions about CAD because [he

was] not familiar . . ."  (Tr. 50, 53).   Finally, Deputy Cox could not explain the apparent

discrepancy between the CAD Sheet and the dispatch recordings [Def. Ex. 3] in the actual time

he initiated the traffic stop.  (Tr. 53).  Specifically, the dispatch recordings reveal that Deputy

Cox first made contact with the dispatcher regarding Defendants' vehicle at 2:48:50, while the

CAD Sheets shows him "At Scene" approximately four minutes earlier.  *Compare* [Def. Ex. 3,

2:48:50], *with* [Def. Ex. 4].

        Despite Deputy Cox's initial suspicion that the driver was intoxicated, he testified that

after making contact with Defendant Iraheta, he had no reason to believe he was intoxicated, did

not perform a field sobriety test, and did not request a DWI unit come to the scene.  (Tr. 26).

Additionally, Deputy Cox had no reason to believe that Defendant Iraheta was under the

influence of any illegal substances, and moreover, there was nothing visible in or any odor

emanating from the vehicle that led him to believe that Defendants were concealing contraband

or narcotics.  *Id.*   According to Deputy Cox's testimony, it was at this point he asked Defendant

Iraheta to exit the vehicle, and then began to question him regarding his travel itinerary.  (Tr. 27).

When pushed on his justification for extending the traffic stop and questioning Defendant

---

the "typist isn't putting the time codes in, the time codes are input as she enters the transactions
that's taking place, like the dispatch, the at scene, the time the primary was assigned, so on and
so forth."  (Tr. 106).  The undersigned notes that the approximate 4 minute discrepancy could be
explained by differences in the clocks, or delays in the inputting of information, and does not
appear to be particularly significant.

Iraheta, Deputy Cox pointed to his training and that he "interact[s] with people all the time on traffic stops and you learn different . . ." (Tr. 34). However, when questioned, Deputy Cox could not identify any specific facts about this precise traffic stop to justify his "field interview" of Defendant Iraheta. *Id.*

Finally, Defense counsel played recordings 3:00:44 and 3:01:21, in which the dispatcher indicated that Defendant Iraheta had no criminal history ("CH") and no outstanding state or federal warrants.[6] [Def. Ex. 3, 3:00:44; 3:01:21]; *see also* (Tr. 40). Thereafter, defense counsel played recording 3:05:35, in which Deputy Cox requested a K-9 unit to the scene of the stop. [Def. Ex. 3, 3:05:35]. Deputy Cox could not recall if he asked for Defendant Iraheta's consent to search before or after requesting the K-9 unit. (Tr. 42). However, Deputy Honey subsequently testified that Deputy Cox made the K-9 request after receiving consent from Defendant Iraheta. (Tr. 84).

<u>Deputy James Christopher Honey</u>

Deputy James Christopher Honey has been employed by the OPSO for a total of 12 years and has earned the rank of Senior Deputy. (Tr. 73). In the early morning of October 27, 2012, Deputy Honey was on "general patrol" predominantly around I-20 to the Lincoln Parish line.[7] *Id*.

---

[6] Although defense counsel did not play the remaining dispatch recordings at the hearing, the undersigned observes that the criminal history of Defendants Gonzalez and Meraz-Garcia was requested at 3:06:19. [Def. Ex. 3, 3:06:19]. The dispatcher responded at 3:10:34, stating there was no criminal history for Defendant Gonzalez; however, at 3:12:43, the dispatcher alerted Deputy Cox that Defendant Miraz-Garcia did have a warrant in California, but there was no extradition request. [Def. Ex. 3, 3:10:34; 3:12:43].

[7] Deputy Honey's unit was equipped with a video and audio recorder; however, it was not functioning the night of the instant traffic stop, and, in any case, his vehicle was not positioned so as to be able to record the events surrounding the stop. (Tr. 94-95).

According to Deputy Honey's testimony, he became aware of the instant traffic stop when Deputy Cox radioed the dispatcher to run the license plate of Defendant Iraheta's vehicle. (Tr. 74).  Deputy Honey testified that he recalled then hearing Deputy Cox call in a "1090" to dispatch, meaning he was going to perform a traffic stop.  (Tr. 92).  Deputy Honey asserts that the information regarding the suspended vehicle registration came back when Deputy Cox was still driving.  (Tr. 94).  Thereafter, Deputy Cox asked Deputy Honey for his location and an appropriate spot to perform the traffic stop.  (Tr. 75).   Deputy Honey testified that he began heading toward Thomas Road; however, it took him additional time to locate Deputy Cox and the stopped vehicle because "he actually stopped it just west of Thomas" at the off-ramp of I-20 to Thomas.  *Id.*  Deputy Honey testified that it took approximately five minutes from the time he received the request to the time of his arrival on the scene.  (Tr. 90).  The CAD Sheet indicates that he arrived "At Scene" at 2:48:05. [Def. Ex. 4]; *see also Id.*

When Deputy Honey arrived at the scene, "[t]he stop had already been made, Deputy Waggoner had arrived on scene, and [he] was the third vehicle."  (Tr. 77).  Upon arriving at the scene, Deputy Honey observed Deputy Cox in the front of his unit checking a driver's license history "and things of that nature," while Defendants were still seated in the vehicle.  *Id.*  Deputy Cox informed the two other deputies of Defendant Iraheta's suspended license and vehicle registration and that he was checking Defendant's criminal history.  (Tr. 78).  At this point, Deputy Honey testified he "moved up to the vehicle . . . positioned [him]self so [he could] watch the driver . . and all occupants while Deputy Cox [was] doing his search."  *Id.*

According to Deputy Honey, after Deputy Cox made contact with the two passenger Defendants, he advised Deputy Honey that "their testimonies were not coinciding."  (Tr. 79).  At

this point, "Deputy Cox began to continue the investigation a little bit further . . . it was beginning to become something a little bit more than just a regular traffic stop." *Id.* However, Deputy Honey could not testify as to what specific set of facts warranted Deputy Cox's moving this from a traffic stop and a traffic citation to now an interrogation of the driver." (Tr. 81). Additionally, Deputy Honey testified that he personally did not observe anything suggesting Defendants were potentially carrying illegal drugs. (Tr. 82).

Deputy Honey's first contact with Defendants came when Deputy Cox removed Defendant Iraheta from the vehicle and brought him back to the shoulder and began speaking to him. (Tr. 83). Once Deputy Cox left Defendant Iraheta to begin questioning the two passenger Defendants, Deputy Honey engaged Defendant Iraheta in "small talk" – discussing "his name, things of that nature." (Tr. 84). As stated *supra*, Deputy Honey was present when Deputy Cox requested consent to search from Defendant Iraheta. Deputy Honey testified that Deputy Cox "asked if he had any illegal narcotics or any weapons or anything of that nature in the vehicle. He answered, 'No.' He asked if he had permission to search the vehicle, at which point [Defendant Iraheta] stated, 'Yes, you have permission.'" (Tr. 87).

According to Deputy Honey, once Defendants were patted down and secured outside the vehicle by Deputy Waggoner, he and Deputy Cox performed the search. (Tr. 85). Specifically, Deputy Cox went to the driver side compartment, while Deputy Honey searched the passenger side and worked back to the front passenger side when Deputy Cox went to the trunk area. (Tr. 86). At this point, the trunk was already opened by Defendant Iraheta because "he asked if he could have his jacket because it was cold." *Id.* Deputy Honey testified that he did not observe

Defendant Iraheta retrieve his coat because he was watching the passenger.  *Id.*  When Deputy Honey was questioned as to Defendant Iraheta's authority to give consent to search the duffle bag, he stated "[Defendant Iraheta] was in control of the vehicle and he did give consent to search the vehicle, if they did not want their property searched at any point in time, all they could have done was said stop."  (Tr. 88).

Deputy Matthew Waggoner

Deputy Matthew Waggoner has been a patrol deputy with OPSO for approximately four years.  (Tr. 107).  Deputy Waggoner reported to the scene of the traffic stop after he overheard Deputy Cox radio dispatch that he was going to initiate a traffic stop in the Thomas Road area.[8] (Tr. 108).  The CAD Sheet indicates that Deputy Waggoner arrived "At Scene" at 2:48:05. [Def. Ex. 4]; *see also* (Tr. 114-15).  Upon arriving at the scene, Deputy Waggoner observed Deputy Cox standing by the driver's door.  (Tr. 109).  Deputy Waggoner's stated role at the scene was officer safety.  (Tr. 110, 113).  Accordingly, he had little contact with Defendants and was unable to testify as to what caused this stop to elevate from a routine traffic stop.  *Id.*  However, Deputy Waggoner did engage in "chit-chat" with Defendants discussing "their destination, where they were going," and the distance to Miami, Florida.  (Tr. 112).

**Law and Analysis**

Defendant Iraheta puts forth three arguments (numbered in his brief as two) in support of his motion to suppress: (1) the arresting officer did not have legal grounds to justify the traffic stop; (2) any consent to search Defendant Iraheta's vehicle was a result of coercion and duress;

---

[8]  According to Deputy Waggoner, his unit is not equipped with a functioning camera or audio capturing system.  (Tr. 113).

and, (3) the search was not reasonably related in scope to the circumstances that justified the initial traffic stop.  [doc. # 43].  Defendant Gonzalez mirrors Defendant Iraheta's three arguments and adds that Defendant Iraheta did not have the apparent authority to give consent to search Defendant Gonzalez's personal belongings.  [doc. # 44].  Finally, Defendant Meraz-Garcia mirrors Defendant Iraheta's first argument, and adds that the officer failed to secure the "appropriate consent prior to searching the bags" – that is, the officer failed to obtain consent from Defendant Gonzalez or Meraz-Garcia to search the remaining bags in Defendant Iraheta's trunk.  [doc. # 47].  These arguments are re-urged and extended in Defendants' supplemental briefs.  *See* [docs. # 65-67].

In its January 28, 2013, opposition, the Government contends that the officer had reasonable suspicion to effectuate the stop because Defendant Iraheta's vehicle crossed the center line, entered the left lane of travel and then abruptly changed lanes into the right lane of travel.  [doc. # 50].  Additionally, the Government adds that the arresting officer observed Defendants acting suspiciously after the stop by (1) Defendant Iraheta's driving with both a suspended driver's license and vehicle registration, (2) Defendants giving conflicting information as to their relations to each other, and (3) Defendants exhibiting a nervous demeanor.  *Id.* at 7-8.  Finally, the Government contends that Defendant Iraheta's consent to search the vehicle was given freely and voluntarily as to the entire vehicle.  *Id.* at 9.  On March 14, 2013, the Government filed its post-hearing brief re-alleging the above-stated arguments.  [doc. # 68].

## I.    The Stop and Detention

Defendants contend that the evidence obtained by the state police should be suppressed

because the stop and their continued detention following the traffic stop violated their rights under the Fourth Amendment.[9]

The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.  A traffic stop entails a seizure for purposes of the Fourth Amendment.  *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (finding that stopping a vehicle and detaining its occupants constitutes a seizure).  Traffic stops, whether supported by probable cause or a reasonable suspicion, are analyzed under the standard established by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968).  *Brigham, supra*. (citations omitted).

Under *Terry*, a law enforcement officer may temporarily detain a person when the "officer has a reasonable, articulable suspicion that a person has committed or is about to commit a crime."  *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (citing *Terry*, 392 U.S. at 30).  Reasonable suspicion may be described as "'a particularized and objective basis' for

---

[9]  The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."  *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *United States v. Parks*, 684 F.2d 1078, 1082 (5th Cir. 1982).  A subjective expectation of privacy is legitimate if it is "one that society is prepared to recognize as reasonable."  *Rakas*, 439 U.S. at 143-44.  Furthermore, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's . . . property has not had any of his Fourth Amendment rights infringed."  *Id.* at 134.  Moreover, it is well established that a passenger-nonowner of a vehicle, has no standing to challenge the search of the contents of the vehicle. *United States v. Roberson,* 6 F.3d 1088, 1093 (5th Cir. 1993); *Rakas*, 439 U.S. at 143.  However, the Government has failed to raise the issue of standing, and therefore, to the extend that Defendants are raising arguments that might be applicable only to their co-defendants, the issue is deemed waived. *See United States v. Gray*, 659 F.2d 1296, 1300 n. 6 (5th Cir. 1981) (citing *Steagald v. United States*, 451 U.S. 204, n.5 (1981).

suspecting the person stopped of criminal activity." *Id*. (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).  To satisfy the Fourth Amendment, the stopping officer must be able to "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Id*. (citing *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000)).  The Fourth Amendment requires but a "minimal level of objective justification for making the stop," and requires "a showing considerably less than preponderance of the evidence."  *Id*. (citation omitted).  The validity of the stop is determined under "the totality of the circumstances — the whole picture." *Id*.  (citing *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989)).

The *Terry* standard is a two-tiered inquiry: (1) whether the officer's action of stopping the vehicle was justified at its inception; and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop.  *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001) (citing *Terry*, 392 U.S. at 19-20).  Typically, the defendant bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional.  *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citation omitted). However, when the law enforcement officer acts without a warrant, the government bears the burden of proving that the search was valid.  *Id*.

    a)      <u>*Terry's* First Prong</u>

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle."  *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).

To the extent that Defendants challenge the propriety of the initial stop, their claim must

fail.  Deputy Cox's testimony that he directly observed the vehicle Defendant Iraheta was

driving make an un-signaled lane change into the inside eastbound travel of I-20 was undisputed.

*See* (Tr. 4, 16, 66).  Deputy Cox's OPSO Incident Report confirms this testimony.  *See* [Def. Ex.

No. 2].  Additionally, Deputy Cox testified that Defendant Iraheta admitted to being fatigued and

claimed to be looking for a place to stop and rest.  The undersigned thus concludes that the

traffic stop was justified at its inception.[10]

> b)      *Terry's* Second Prong

The second prong of the *Terry* inquiry focuses upon whether the stopping officer's

actions were

> reasonably related to the circumstances that justified the stop, or to dispelling his
> reasonable suspicion developed during the stop.  This is because a detention must
> be temporary and last no longer than is necessary to effectuate the purpose of the
> stop unless further reasonable suspicion, supported by articulable facts, emerges.

*Brigham*, 382 F.3d at 507 (citations omitted).

The Fifth Circuit has recognized that pursuant to an initial traffic stop, a police officer

may (1) examine the driver's license and registration of the driver and vehicle, and run a

computer check to investigate whether the driver has any outstanding warrants and if the vehicle

was stolen; (2) ask the driver to exit the vehicle; and (3) ask the driver and any passengers about

the purpose and itinerary of their trip, including other unrelated questions.[11]  *See generally*

---

[10]  Although there is conflicting evidence as to whether Deputy Cox initiated the traffic stop before or after being notified of the vehicle's expired registration, the undersigned need not resolve this conflict because Deputy Cox's observation of illegal lane usage is sufficient to justify the traffic stop at its inception.

[11]  "[T]he officer's questions need not even be related to the purpose of the traffic stop, since '[d]etention, not questioning, is the evil at which *Terry's* second prong is aimed.'"  *Lopez-Moreno*, 420 F.3d at 431.

*Brigham*, 382 F.3d at 508; *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999); *Shabazz*, 993 F.2d at 437.

Detention during these actions is reasonable under the Fourth Amendment; however, detention which occurs because of additional actions, particularly those taken after a police officer has verified that a driver is not subject to any warrants and that a vehicle is not stolen, may only be taken when there is a reasonable and articulable suspicion that a person has committed or is about to commit a crime. *See United States v. Jones*, 234 F.3d 234, 241 (5th Cir. 2000). "The suspicion required to justify such a detention need not rise to the level of probable cause but must be based on more than an unparticularized suspicion or hunch." *Id.* (citing *Sokolow*, 490 U.S. at 7). When making a reasonable-suspicion determination, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."[12] *United States v. Grant*, 349 F.3d 192, 197 (5th Cir. 2003) (quoting other sources). If reasonable suspicion appears during the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed. *See Lopez-Moreno*, 420 F.3d at 431 (5th Cir. 2005); *Brigham*, 382 F.3d at 507.

In this case, then, the question is whether Deputy Cox's actions after he legitimately stopped Defendants were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion based on articulable facts developed during the stop. Here,

---

[12] The Fifth Circuit reiterated, however, that police need not "have 'particularized suspicion' based on essentially direct evidence of a particular specific crime in order to form the 'reasonable suspicion' needed to justify a detention." *United States v. Pack*, 612 F.3d 341, 356-57 (5th Cir. 2010).

Deputy Cox's initial questioning of Defendant Iraheta was fully within the scope of the initial traffic stop.  As cited above, the Fifth Circuit has repeatedly held that pursuant to a valid stop, a police officer may request the driver's license and registration, run a license and criminal background check, and question the driver regarding her origin and itinerary.  *See Dortch, supra.* The Fifth Circuit has also stated that "the Fourth Amendment permits '[a] police officer [to] undertake similar questioning of the vehicle's occupants to verify the information provided by the driver.'" *Pack*, 612 F.3d at 351 (citing *Brigham*, 382 F.3d 508 (quoting *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002)).  However, "[o]nce a computer check is completed and the officer either issues a citation or determines that no citation should be issued, the detention should end and the driver should be free to leave. In order to continue a detention after such a point, the officer must have a reasonable suspicion supported by articulable facts that a crime has been or is being committed."  *United States v. Santiago*, 310 F.3d 336, 341-42 (5th Cir. 2002).

Here, Deputy Cox asked Defendant Iraheta why he crossed the lane dividing line, asked for his driver's license, and ran all appropriate computer checks.  These initial questions were related to the purpose and itinerary of Defendants' trip, only lasted approximately nine minutes[13], and were fully within the scope of the detention justified by the traffic stop.  *See Brigham*, 382 F.3d at 507-08.  Additionally, the record reveals that the last computer check on Defendant-passengers did not come back until 3:12:43 – that is, when the dispatcher alerted the deputies that Defendant Meraz-Garcia had an outstanding warrant in California.  *See* [Def. Ex. 3,

---

[13]   The dispatch recordings show that Deputy Cox initiated the stop by 2:57:47 and the testimony of Deputy Honey indicates that Deputy Cox requested consent before 3:05:35.  *See* (Tr. 84).

3:12:43][14]. According to Deputy Honey's testimony, Defendant Iraheta had granted consent to search the vehicle approximately six minutes before the last computer check was processed. *Compare* (Tr. 84), *with* [Def. Ex. 3, 3:06:19; 3:12:43].  Thus, no Fourth Amendment harm is done where the officer asks the occupants of a vehicle questions while waiting for routine computer checks to be processed.  *Pack*, 612 F.3d at 350.  For this reason, the detention of Defendants was constitutional.[15]

### III.    The Search

As discussed above, Deputy Cox asked Defendant Iraheta for permission to search his vehicle.  When consent is considered to have validated a warrantless search, the court must examine "the totality of the circumstances to determine whether the consent was knowingly and voluntarily given."  *United States v. Davis*, 749 F.2d 292, 294 (5th Cir. 1985).  "The voluntariness of consent is a question of fact" that is reviewed for clear error. *United States v. Solis*, 299 F.3d 420, 436 (5th Cir. 2002).

A federal court "considers six factors in evaluating the voluntariness of consent to search, all of which are relevant, but no one of which is dispositive or controlling."  *United States v. Santiago*, 410 F.3d 193, 199 (5th Cir. 2005).  Those six factors are: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures;

---

[14]   The undersigned observes that it took approximately six minutes for the dispatcher to respond with the criminal history check for Defendant-passengers because there were too many individuals with similar names residing in California.  *See* [Def. Ex. 3, 3:11:41].

[15]   The Court further notes that the deputies had additional reasonable suspicion to extend the length of the traffic stop because Defendant Iraheta's driver's license and vehicle registration were reported suspended.  *See United States v. Fishel*, 467 F.3d 855, 856-57 (5th Cir. 2006); *United States v. Galindo*, 447 F. App'x. 633, 635 (5th Cir. Tex. 2011) (finding that driving with a suspended or expired driver's license, amongst other factors, created additional reasonable suspicion sufficient to extend a traffic stop).

(3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.  *Id.*  The Government must prove consent by a preponderance of the evidence.  *United States v. Hurtado*, 905 F.2d 74 (5th Cir. 1990) (en banc).

However, the Court must first determine whether Defendant Iraheta, as the driver of the vehicle, had the proper authority to give consent to the search of the duffle bags.  A finding of actual authority requires proof that the consenting party and the party challenging the search "mutually used the property searched and had joint access to and control of it for most purposes, so that it is reasonable to recognize that either user had the right to permit inspection of the property and that the complaining co-user had assumed the risk that the consenting co-user might permit the search." *United States v. Rizk*, 842 F.2d 111, 112-13 (5th Cir. 1998).  Alternatively, a finding of apparent authority requires proof that the searching officers "reasonably (though erroneously) believe[d] that the person who has consented to their" search had authority to do so.  *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990).

Defendants rely on *United States v. Jara*s for the proposition that "the government must prove that Mr. Iraheta and Mr. Meraz-Garcia 'mutually used' the bags and that they 'had joint access to and control of the bags for most purposes, so that it is reasonable to recognize that either had the right to permit inspections' of the bags and that each 'had assumed the risk that the consenting co-user might permit the search.'" [doc. # 67, P. 16] (citing 86 F.3d 383, 389 (5th Cir. 1996); *United States v. Rizk*, 842 F.2d 111,112 (5th Cir. 1998)).  In *Jaras*, police received consent for a search of a vehicle and a suitcase located in the trunk of the vehicle from the driver

of the vehicle.  *Jara*s, 86 F.3d at 386.  The driver told the officers that the suitcases belonged to his passenger, the defendant Jaras.  *Id.*  After the driver gave the officer general consent to search the vehicle, the police found the defendant's suitcases containing marijuana in the car's trunk.  *Id.*  The court held that "the fact that Jaras's suitcases were contained in the trunk of a car in which he was a passenger is insufficient to show that [the driver] mutually used and had joint control over the suitcases."  *Id.* at 389.  Therefore, the court concluded that the search of Jaras' suitcase violated the Fourth Amendment because the driver had neither actual nor apparent authority to consent to a search of his passenger's property.  *Id.* at 390-91.

However, in *United States v. Navarro*, the Fifth Circuit upheld the search of a duffle bag when the driving-consenting party gave "no indication" that the bag belonged to someone else. 169 F.3d 228, 232 (5th Cir.1999).  In *Navarro*, as in *Jaras*, a driver consented to a search of his vehicle, which contained a closed duffle bag on the back seat. Unaware that the duffle bag belonged to a passenger, police opened the bag and found methamphetamine.  *Id.* at 230.  The Fifth Circuit distinguished *Jaras* and allowed the contents of Navarro's duffle bag to be admitted because the officers in *Navarro* had "no indication" that the bag belonged to someone other than the driver and the duffle bag was in the back seat of the vehicle.  *Id.* at 232; *see also United States v. Cantu*, 426 F. App'x. 253, 257-58 (5th Cir. 2011) (explaining the Fifth Circuit's distinction between *Jaras* and *Navarro*).

The undersigned notes that there are two fundamental distinctions in the facts of *Jaras* and *Navarro* resulting in the divergence in the Fifth Circuit's holdings.  Specifically, in *Jaras*, the suitcase was in the trunk of the vehicle, while in *Navarro*, the duffle bag was on the back seat.  Moreover, in *Jaras*, the driver explained to the officer that the suitcase belonged to the

passenger; conversely, in *Navarro*, the driving-consenting party gave "no indication" that the bag belonged to someone else.  However, in both *Jaras* and *Navarro*, the non-consenting passengers neither consented nor did they specifically object to the search of their respective bag or suitcase.

In the present matter, analogous to *Jaras* and unlike *Navarro*, the duffle bags at issue were located in the trunk of the vehicle.  Therefore, the undersigned cannot find that Defendant Iraheta had actual authority over the duffle bags because there is no evidence in the record that "he mutually used" the duffle bags and "had joint access to and control of it for most purposes." *Rizk*, 842 F.2d at 112-13.  However, unlike *Jaras*, Defendant Iraheta did not explicitly tell any of the deputies that the duffle bag in question belonged to either of the non-consenting Defendants. But, unlike *Navarro*, the deputies cannot reasonably argue that they had "no indication" that the duffle bag belonged to either Defendant Gonzalez or Defendant Meraz-Garcia.  Thus, the present matter lies somewhere in between *Jaras* and *Navarro*. The undersigned finds that, although Defendant Iraheta did not explicitly advise the deputies that the duffle bag did not belong to him, it was unreasonable for the deputies to assume that Defendant Iraheta had the right to permit inspection of all of the duffle bags.  The deputies were aware that Defendants were on a road trip from California to Miami, Florida and that the trunk contained multiple travel bags[16]; therefore, the Government is unable to demonstrate, by a preponderance of the evidence, that a reasonable officer would have "no indication" that the searched duffle bag belonged to someone other than Defendant Iraheta.  Finally, as in *Jaras*, it is of no consequence in the present case that

---

[16]  The undersigned notes that the precise number of bags in the trunk is not in the record; however, Deputy Cox acknowledged there was more than one bag in the trunk.  (Tr. 46)

Defendants Gonzalez and Meraz-Garcia did not object to Deputy Cox's search of the duffle bag. *See Jaras*, 86 F.3d at 390 ("We do not think that consent may reasonably be implied from Jaras's silence or failure to object because Officer Mitchell did not expressly or impliedly ask for his consent to search.").

As such, the undersigned concludes that the search was not justified on the basis of Defendant Iraheta's general consent to search the vehicle.  Moreover, under the circumstances of the present case, consent to search of the duffle bag cannot be inferred from Defendant Gonzalez's and Meraz-Garcia's silence and failure to object because the deputies did not expressly or implicitly request their consent prior to the search.  As Deputy Cox did not have consent to search the duffle bags, the contraband he seized was the fruit of an illegal search and should be suppressed by the Court.

## Conclusion

For the above-stated reasons,

**IT IS RECOMMENDED** that the motions to suppress [docs. # 43, 44, 47] filed by Defendants William A. Iraheta, Christian M. Gonzalez, and Rodolfo Meraz-Garcia be **GRANTED**, and that all evidence discovered in the search of the bags contained in the trunk of Defendant Iraheta's vehicle on October 27, 2012 be **SUPPRESSED**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of

filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 18th day of March 2013.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE